## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

David G. Velde, as Trustee of
the Daniel S. Miller Bankruptcy
Estate,

                                    Plaintiff,

                                                    Civil No. 04-4957 (RHK/RLE)
v.                                                  **MEMORANDUM OPINION
                                                    AND ORDER**

Brian Nelson,

                                    Defendant.

---

David G. Velde, as Trustee of
the Daniel S. Miller Bankruptcy
Estate,

                                    Plaintiff,

                                                    Civil No. 05-794 (RHK/RLE)
v.                                                  **MEMORANDUM OPINION
                                                    AND ORDER**

Mark Wavra,

                                    Defendant.

---

David G. Velde, as Trustee of
the Daniel S. Miller Bankruptcy
Estate,

                         Plaintiff,

                                                Civil No. 05-795 (RHK/RLE)

v.                                         **MEMORANDUM OPINION
AND ORDER**

Nikle Farms, Inc.,

                         Defendant.

David G. Velde, as Trustee of
the Daniel S. Miller Bankruptcy
Estate,

                         Plaintiff,

                                                Civil No. 05-797 (RHK/RLE)

v.                                         **MEMORANDUM OPINION
AND ORDER**

Thompson Brothers Farms LLP,

                         Defendant.

David G. Velde, as Trustee of
the Daniel S. Miller Bankruptcy
Estate,

                                        Plaintiff,

                                                     Civil No. 05-798 (RHK/RLE)
v.                                                   **MEMORANDUM OPINION
                                                     AND ORDER**

Mitch Wavra,

                              Defendant.

Justin P. Weinberg, Mary Kay Mages, and Michael S. Dove, Gislason & Hunter LLP, New
Ulm, MN, for the Trustee.

Jon R. Brakke, Leah Marie Warner, and Tami L. Norgard, Vogel Law Firm, Fargo, ND, for
the Defendants.

## Introduction

At issue in the five adversary proceedings now before the Court are certain

payments made by Daniel Miller, the debtor, to Defendants Brian Nelson, Mark Wavra,

Mitch Wavra, Nikle Farms, Inc., and Thompson Brothers Farms LLP (collectively

"Defendants"), for the purchase of grain and other crops.  The Trustee in Bankruptcy (the

"Trustee") seeks to avoid the payments as preferential transfers pursuant to 11 U.S.C. §

547(b).[1]  Defendants have moved for summary judgment, asserting one or both of two

defenses, under which each would be immune from the Trustee's power of avoidance.  See

11 U.S.C. § 547 (c)(1), (2).  In two of the actions, the Trustee has filed cross-motions for

summary judgment.  For the reasons set forth below, the Court will grant Defendants'

Motions, and deny the Trustee's Motions.

## Background

At the time of the payments at issue in these actions, Miller was the owner of

Danielson Grain, a crop storage elevator; as the owner, he stored, bought, and sold crops.

On February 3, 2004, an involuntary Chapter 7 petition was filed against Miller.  On

February 18, 2004, Miller converted the involuntary petition to a case under Chapter 11.

And on September 29, 2004, the Court converted the case to a Chapter 7, appointing David

Velde as Trustee.  Each of the Defendants in these adversary proceedings sold their crops

to Miller within the 90-day period prior to February 3, 2004.  In analyzing the motions

before it, the Court will first set forth the applicable law and then consider the application

of the law to the facts of the cases.

---

[1]Pursuant to 11 U.S.C. § 547(b),

a bankruptcy trustee may avoid the transfer to a creditor of an interest in
property by the debtor that is made (1) on or within 90 days before the date
of the filing of the bankruptcy petition, (2) while the debtor was insolvent,
(3) on account of an antecedent debt, and (4) which enables the creditor to
receive more than it would have received in a bankruptcy liquidation.

Lovett v. St. Johnsbury Trucking, 931 F.2d 494, 497 (8th Cir. 1991).

**Applicable Law**

The bankruptcy code provides that a trustee in bankruptcy may avoid certain "preferential" transfers made 90 days before the petition for bankruptcy is filed.  See 11 U.S.C. § 547(b); In re Spirit Holding, Co., 153 F.3d 902, 903 (8th Cir. 1998).  A payment that is a preference under § 547(b) may, however, "remain unavoided if it falls within one of the Bankruptcy Code's § 547(c) exceptions."  In re Armstrong, 291 F.3d 517, 524 (8th Cir. 2002).  At issue here are two of the § 547(c) defenses.

**A.      Ordinary Course of Business**

Under § 547(c)(2), if the contested payments were made in the ordinary course of business they are not subject to the trustee's power of avoidance.  In re Spirit Holding, Co., 153 F.3d at 903.  Four of the five Defendants have asserted this defense.[2]  To qualify as a transfer made in the ordinary course of business, a transfer must: (1) be for a debt incurred in the ordinary course of business; (2) be made in the ordinary course of business or financial affairs of the debtor and the transferee; and (3) be made according to ordinary business terms.[3]  Id. at 904; 11 U.S.C. § 547(c)(2).

---

[2]Brain Nelson, Civ. No. 04-4957; Mark Wavra, Civ. No. 05-794; Mitch Wavra, Civ. No. 05-798; and Thompson Brothers Farms LLP, Civ. No. 05-797.

[3]For purposes of these proceedings, § 547(c)(2) provides that a trustee cannot avoid a transfer that was:

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

"There is no precise legal test which can be applied in determining whether payments by the debtor during the 90-day period were made in the ordinary course of business; rather, the court must engage in a peculiarly factual analysis." In re Spirit Holding, Co., 153 F.3d at 904 (internal quotations and alterations omitted).  "[T]he purpose of this section was to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." Id. (internal quotation omitted); see also In re Armstrong, 291 F.3d at 527 (noting that the policies

---

      (B) made in the ordinary course of business or financial affairs of the debtor
      and the transferee; and

      (C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2) (pre-2005 amendments) (emphasis added).

      Subsequent to the initiation of the underlying bankruptcy case, and the initiation of the instant adversary proceedings, § 547(c)(2) was amended to provide:

      The trustee may not avoid under this section a transfer—

(2) to the extent such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—

      (A) made in the ordinary course of business or financial affairs of the debtor and the
      transferee; or

      (B) made according to ordinary business terms.

11 U.S.C. § 547(c)(2) (2005) (emphasis added).  The parties appear to be in agreement that the prior version of the statute applies to the instant cases, although neither party expressly addresses the amended statute.

underlying this exception are "(1) to encourage creditors to continue dealing with troubled

debtors, and (2) to promote equality of distribution").

There is no dispute in these cases that the first prong of the ordinary business

defense is satisfied—each of the transfers was for a debt incurred in the ordinary course of

business. See 11 U.S.C. § 547(c)(2)(A). The dispute revolves around whether the second

and third statutory requirements are satisfied.

With respect to the second element—that the payments were made in the ordinary

course of business of the debtor and the creditor—the "cornerstone . . . is that the creditor

needs to demonstrate some consistency with other business transactions between the

debtor and the creditor." In re Spirit Holding, Co., 153 F.3d at 904 (internal quotation and

alteration omitted). The Court must focus "broadly on the consistency between the transfer

at issue and other business transactions between the debtor and the creditor." Id. at 905

(citation omitted).

The third element—that the payments were made "according to ordinary business

terms"—is a "separate and discrete inquiry from the practice between the parties," and

requires that the creditor prove "any objective industry practice under subsection

(c)(2)(C)." In re U.S.A. Inns of Eureka Springs, Arkansas, Inc., 9 F.3d 680, 684 (8th Cir.

1993). It requires "evidence of a prevailing practice among similarly situated members of

the industry facing the same or similar problems." Id. at 685. The focus of this element

"should be on whether the terms between the parties were particularly unusual in the

relevant industry, and that evidence of a prevailing practice among similarly situated

members of the industry facing the same or similar problems is sufficient to satisfy" the

burden.  Id.  "[O]nly dealings so idiosyncratic as to fall outside that broad range [of

prevailing practices within an industry] should be deemed . . . outside the scope of [this]

subsection."  Id.

**B.      Contemporaneous Exchange**

Some of the Defendants also raise the affirmative defense set forth in 11 U.S.C. §

547(c)(1).[4]  Under the § 547(c)(1) defense, the Trustee may not avoid a transfer to the

extent that such transfer was:

> (1) intended by the debtor and the creditor to or for whose benefit such
> transfer was made to be a contemporaneous exchange for new value given to
> the debtor; and
>
> (2) in fact a substantially contemporaneous exchange.

Contemporaneous exchanges are not preferential for two reasons: "(1) because they

encourage creditors to deal with troubled debtors and (2) because other creditors are not

adversely affected if the debtor's estate receives new value."  In re Armstrong, 291 F.3d at

525 (citation omitted); see also In re Jones Truck Lines, Inc., 130 F.3d 323, 326 (8th Cir.

1997).  To establish the contemporaneous exchange defense, Defendants "must show that:

(1) both the Creditor—[Defendants] and the Debtor—[Miller] intended a contemporaneous

exchange; (2) the exchange was in fact contemporaneous; and (3) the exchange was for new

value."  In re Armstrong, 291 F.3d at 525 (citation omitted).

---

[4]Mark Wavra, Civ. No. 05-794; Mitch Wavra, Civ. No. 05-798; and Nikle Farms Inc.,
Civ. No. 05-795.

"The critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange. . . . The existence of such an intent is a question of fact." Id. (internal quotation omitted). The statute also requires that the exchange in fact be "substantially contemporaneous." In re Dorholt, Inc., 224 F.3d 871, 874 (8th Cir. 2000). "The modifier 'substantial' makes clear that contemporaneity is a flexible concept which requires a case-by-case inquiry into all relevant circumstances." Id. (internal quotation omitted). "'New value' for § 547(c) purposes includes 'money or money's worth in goods, services, or new credit.'" In re Jones Truck Lines, Inc., 130 F.3d at 327 (quoting § 547(a)(2)).

With these principles in mind, the Court turns to a consideration of the facts of the cases before it.

**Standard of Decision**

Summary judgment is proper if, drawing all reasonable inferences favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th

9

Cir. 2000); <u>Calvit v. Minneapolis Pub. Schs.</u>, 122 F.3d 1112, 1116 (8th Cir. 1997).  The

nonmoving party may not rest on mere allegations or denials, but must show through the

presentation of admissible evidence that specific facts exist creating a genuine issue for

trial.  <u>See</u> <u>Anderson</u>, 477 U.S. at 256; <u>Krenik v. County of Le Sueur</u>, 47 F.3d 953, 957 (8th

Cir. 1995).

**Analysis**

**A.      Ordinary Business Terms**

     As mentioned above, four of the five Defendants have asserted the ordinary course

of business defense.[5]  One of the arguments the Trustee has made in opposition to these

motions is common to each of these four Defendants; therefore, the Court will address it

initially.  The Trustee argues that Defendants cannot establish the defense because they

have failed to show the third element—that Miller's payments to them, by which he

purchased their crops, were made in accordance with "ordinary business terms" in the

industry.  <u>See</u> 11 U.S.C. § 547(c)(2)(C).  Specifically, the Trustee argues that the

Minnesota Grain Buyer's Act, Minn. Stat. § 223.15, *et seq.*, establishes the "ordinary

business terms of the grain buying industry" for purposes of this § 547 inquiry, and that

none of the payments made by Miller to Defendants conformed with that Act.  (<u>See, e.g.</u>,

Mitch Wavra Mem. in Opp'n at 8-10.)

---

    [5]Brain Nelson, Civ. No. 04-4957; Mark Wavra, Civ. No. 05-794; Mitch Wavra, Civ.
No. 05-798; and Thompson Brothers Farms LLP, Civ. No. 05-797.

The Minnesota Grain Buyer's Act sets forth "two kinds of grain sales" in the context of the requirement that "a grain buyer must obtain a bond to compensate the seller for loss caused by the buyer's failure to pay the contract price." In the matter of the Grain Buyer's Bond No. 877706-08624237, 486 N.W.2d 466, 468 (Minn. Ct. App. 1992). Pursuant to the Act, in cash sales (where payment is required to be contemporaneous with the sale), the seller is allowed to make a claim on the bond, whereas in voluntary extension of credit sales (the terms of which are required to be in writing), the grain seller is unprotected by the bond. Id.

According to the Trustee, each of Miller's payments to the relevant Defendants would have been a cash sale under the Act, not a voluntary extension of credit, because of the lack of a proper writing memorializing the deferred payment contracts. (See, e.g., Mitch Wavra Mem. in Opp'n at 9-10.) The Trustee goes on to argue that, because Defendants did not receive payment from Miller within the statutorily prescribed period of time for cash sales ("not later than the close of business on the next business day, or within 48 hours, whichever is later," Minn. Stat. § 223.16, Subd. 2a), those payments cannot be within ordinary business terms for the industry. (Id.)

The Court fails to see the relevance of the Minnesota Grain Buyer's Act to the instant inquiry. The Act governs the circumstances under which a grain seller may be protected by the buyer's bond. That the transactions here may not have conformed to the statutory provisions that could affect Defendants' ability to make a claim under Miller's bond (if he had one) is a purely hypothetical issue; none of the parties is making a claim on

11

Miller's bond, most likely because Miller did not "fail to pay the contract price."  Grain

Buyer's Bond, 486 N.W.2d at 468.  In fact, he did pay the contract price in each

instance—that is why the parties are presently before the Court.

Furthermore, the Trustee fails to give the Court any reason why the Act should set

the industry standard for the purchase of grain or other crops (other than its existence).

Nor does the Trustee cite to authority indicating that the presence of such a statute—that is

at best tangentially related to the issues presented in this action—is conclusive evidence of

an industry standard.[6]  Most importantly, however, the Trustee does not present any

evidence that the industry standards actually conform to the statutory guidelines set out in

the Minnesota Grain Buyer's Act.  Accordingly, the Court determines that the presence of

the Minnesota Grain Buyer's Act does not raise an issue of fact as to the "ordinary business

terms" element of this defense.[7]  Thus, the Court will turn to a consideration of the

individual cases.

---

[6]The Court notes that its research has revealed only a limited number of cases
(either published or unpublished) citing to the Minnesota Grain Buyer's Act.  This hardly
indicates that the Act's influence is so pervasive as to be capable of setting industry
standards.

[7]In some of the instant actions, the Trustee made a similar argument with reference
to the National Grain Trade Rules of the National Grain and Feed Association (the "Rules").
(See, e.g., Thompson Brothers Mem. in Opp'n at 10-11.)  Similar to the Minnesota Grain
Buyer's Act, the Rules require that oral contracts be confirmed in writing, "not later than
the close of the next business day."  (Id. at 11.)  The Court's reasoning with respect to the
Minnesota Grain Buyer's Act applies with equal force to the Trustee's argument based on
the Rules; accordingly, the Court rejects this argument as well.

B.      **Defendant Brian Nelson**[8]

Defendant Nelson has been farming for approximately fifteen years, and had a business relationship with Miller for approximately twelve years.  (Nelson Aff. ¶¶ 1, 2.) Throughout their business relationship, Nelson would sell crops to Miller pursuant to oral deferred payment contracts.  (Id. ¶ 3.)  Under these oral contracts, the parties would agree upon a price and contract for delivery after Nelson's crops were harvested, and Miller would pay Nelson "shortly after the start of the new year."  (Id.)  Nelson avers that "[t]he use of deferred payment contracts is a common business practice of other elevators, such as St. Hillaire Elevator and the North Dakota State Mill, with which [he has] done business." (Id. ¶ 4.)  He further avers that he has "entered into deferred payment contracts with" those elevators.  (Id.)

In 2003, Nelson priced wheat and soybeans, delivered them to Miller, and entered into to deferred payment contracts for the sale of the crops to Miller.  (Id. ¶¶ 6, 7.)  On January 5, 2004, in accordance with those contracts, Miller remitted payment to Nelson of $5,275.00 for the wheat, and $23,545.00 for the soybeans.  (Id.)  According to Nelson, because January 5, 2004 was the "first working day of the New Year," those payments were consistent with the previous deferred payment contracts between the parties.  (Id. ¶ 8.)  The course and timing of the 2003-2004 transactions between Nelson and Miller are consistent

---

[8]Civ. No. 04-4957.

with the course and timing of their transactions in 2000-2001 (Nelson Supl. Aff. ¶ 4, 5),

2001-2002 (id. ¶ 6), and 2002-2003 (Nelson Aff. ¶ 5).

Nelson contends that the subject payments are not avoidable by the Trustee because

they fall under the ordinary course of business exception set forth in § 547(c)(2).  The

Trustee has moved for summary judgment on Nelson's defense, arguing that Nelson is

unable to establish the ordinary course of business defense because (1) he cannot

demonstrate that oral deferred payment contracts are within ordinary business terms

(Nelson Mem. in Opp'n at 5-10), and (2) he has not demonstrated that the contested

payments were consistent with the ordinary course of business between the parties (id. at

12).

With respect to the Trustee's first argument, the Court considered and rejected it

above.  (See supra pp.10-12.)  Furthermore, the Court determines that Nelson has

submitted a sufficient showing that the deferred payment contracts entered into by the

parties are consistent with ordinary business terms in the industry.  (Nelson Aff. ¶ 4.)  See

In re U.S.A. Inns of Eureka Springs, 9 F.3d at 685.

With respect to his second argument, the Trustee has submitted evidence of two

transactions in which Nelson sold Miller soybeans in 2002, and was paid in December

2002, rather than January 2003.  (Nelson Mem. in Opp'n at 12; Weinberg Aff. Exs. D, E.)

According to the Trustee, these two transactions are sufficiently different from the subject

payments, so as to prevent Nelson from establishing that those payments were consistent

with the parties' ordinary course of business.

14

The Court disagrees.  While the two 2002 payments are distinct from those at issue here—in that Miller paid Nelson in December rather than in early-January ("shortly after the start of the new year" (Nelson Aff. ¶ 3)), they are also consistent with the payments at issue here—in that they reinforce Nelson's averments that the parties regularly entered into deferred payment contracts.  Moreover, Nelson has submitted undisputed evidence of past payments between the parties that <u>do</u> conform to the timing of the subject payments in that Miller paid Nelson in January of the year following the sale of Nelson's crops.  That there is evidence of two transactions which conformed to the pattern of the contested payments but did not culminate in payment in the same month as those payments, does not raise an issue of fact as to this element of the defense.  <u>See</u> <u>Lovett v. St. Johnsbury Trucking</u>, 931 F.2d 494, 498 (8th Cir. 1991) (noting that burden is satisfied where the creditor establishes that the "timing of the payments . . . reflected some consistency" with past practice).  Accordingly, the Court determines that Nelson has satisfied his burden to establish that the ordinary course of business defense applies to the subject payments, and he is entitled to summary judgment on this claim.  The Trustee's cross-motion for summary judgment will be denied.[9]

---

[9]The Trustee has also brought claims under 11 U.S.C. §§ 550 and 502(d).  Nelson asserts—and the Trustee does not dispute—that, to the extent Nelson is successful on his § 547 defense, these claims must fail.  (Mem. in Supp. at 7.)  Accordingly, Nelson's motion for summary judgment as to these claims will be granted as well.

**C.** **Defendants Mark and Mitch Wavra**[10]

Defendants Mark and Mitch Wavra are in the business of raising crops for sale as owners and operators of Wavra Bros., and have been farming for over thirty years.  (Mark Wavra Aff. ¶ 2.)  Mark and Mitch began doing business with Miller in 2001.  (<u>Id.</u> at 2, 3.)  The ordinary dealings between the parties involved Miller storing grain for Wavra Bros., during which time Wavra Bros. continued to own the grain and had the ability to withdraw the grain from Miller's facilities for sale or storage somewhere else, or elect to sell the grain to Miller.  (<u>Id.</u>)  In the event Wavra Bros. decided to sell their grain to Miller, they would notify Miller of their intention and, within a few days, would pick up their payment from Miller.  (<u>Id.</u>)

Consistent with this practice, Wavra Bros. delivered wheat to Miller's facilities for storage in August 2003.  (<u>Id.</u> ¶ 5.)  On December 3, 2003, Mark contacted Miller to notify him that Wavra Bros. wanted to sell the stored wheat.  (<u>Id.</u> ¶ 7.)  Miller then assessed the storage charges for the wheat and, on December 9, 2003, within a few days of being notified of Wavra Bros.'s desire to sell, Miller issued Mark and Mitch payment for the wheat (in the amount of $34,102.14 to each of them[11]).  (<u>Id.</u> ¶¶ 9, 10.)

---

[10]Civ. No. 05-794; and Civ. No. 05-798.

[11]Payment to Wavra Bros. from Miller was in the form of two checks—one to Mark and one to Mitch—representing each brother's equal share of the wheat.  Thus, despite the fact that there are two separate adversary actions for Mark (Civ. No. 05-794) and Mitch (Civ. No. 05-798), the actions involve the same transaction, and the same facts and circumstances.

Mark and Mitch aver that this practice is consistent with "the ordinary business practices of other buyers and sellers of grain." (Id. ¶ 4.)  They work with other elevators and engage in the same storage, selling, and payment practices with those other elevators. (Id.)  They assert that "the business practices [they] had with Miller in storing the grain for a fee before selling it is identical to the practices [they] have with other elevators."  (Id.)

Mark and Mitch claim that the December 9, 2003 payments are not avoidable under § 547(c)(2) because they fall under the ordinary course of business exception.[12]  The Trustee counters that their transaction does not fall within normal business terms in the industry (Wavra Mem. in Opp'n at 7-10), and that they cannot establish that they entered into a storage agreement with Miller (id. at 5-6).

The Trustee's first argument—because the Wavras were paid six days after they communicated their desire to sell their grain to Miller (two of which were a weekend), the Minnesota Grain Buyer's Act establishes their payment was not within normal industry terms—has been addressed and rejected by the Court.  (See supra pp.10-12.)  Furthermore, the Court determines that the averments of Mitch and Mark to the effect that it is common industry practice to store and sell grain in the manner that they did with Miller, and that they follow this practice with other elevators, are sufficient to establish that this transaction was within common business terms of the industry.  See, e.g., In re U.S.A. Inns of Eureka

---

[12]Mark and Mitch also argue that the payments fall under the contemporaneous exchange for new value exception.  Because the Court determines that they have established that the payment was made within the ordinary course of business, it need not reach that issue.

Springs, 9 F.3d at 685 (noting that "only dealings so idiosyncratic as to fall outside that

broad range [of prevailing practices among similarly situated members of the industry]

should be deemed extraordinary and therefore outside the scope of [this] subsection").

The Trustee also argues that there are issues of fact as to whether the Wavras

entered into a storage agreement with Miller.  The Trustee points to scale tickets issued by

Miller for the Wavras' grain that do not indicate—one way or the other—whether the grain

was there for storage or for immediate sale.  (Weinberg Aff. Ex. A.)  However, the Trustee

points to no evidence to refute the averments of Mark and Mitch that they had an agreement

with Miller to store the grain, were assessed storage charges at the time of the sale of the

grain to Miller, and were paid for their grain shortly thereafter.  That the scale tickets do

not indicate the agreement of the parties is not relevant to the instant inquiry.  See, e.g.,

Lovett, 931 F.3d at 497-99 (noting that the "ordinary course of business . . . was the way the

parties actually conducted their business dealings, not the conditions specified in the

agreement that the parties in fact rarely followed").  Accordingly, the Court determines that

Miller's payments to the Wavras fall within the ordinary course of business exception, and

the Wavras are entitled to summary judgment on his claims.[13]

_____

[13]The Trustee has also brought claims under 11 U.S.C. §§ 550 and 502(d).  Mark and
Mitch assert—and the Trustee does not dispute—that, to the extent they are successful on
their § 547 defense, these claims must fail.  (See, e.g., Mark Wavra Mem. in Supp. at 8-9.)
Accordingly, the Wavras' motions for summary judgment as to these claims will be granted
as well.

**D.        Defendant Thompson Brothers Farms LLP**[14]

Defendant Thompson Brothers Farms, LLP ("Thompson Brothers") has been in

existence since 2000, and was formed by David and Kevin Thompson.  (Thompson Aff. ¶¶

1, 2.)  Prior to the formation of Thompson Brothers, David and Kevin farmed with their

father, Ordean Thompson (collectively the "Thompsons").  (Id.)

> Throughout his forty years of farming, Ordean avers that:
>
> it was my ordinary business practice to sell wheat pursuant to deferred
> payment contracts.  About half the time we would price the crops, then
> deliver and be paid on a deferred basis.  The rest of the time, we would
> deliver the crops, price them later and be paid on a deferred basis.  In all
> circumstances, payment would be deferred to a later date.

(Ordean Aff. ¶ 3.)  In the 1990's, when Miller became the manager of a grain elevator that

the Thompsons had been working with, they worked with Miller on the sales of their crops.

(Id. ¶ 5.)  Those sales were made pursuant to oral deferred payment contracts.  (Id.)  After

Miller started Danielson Grain, the Thompsons sold crops to him, and those crops, too,

were sold pursuant to oral deferred payment contracts.  (Id. ¶ 8.)

After Ordean retired, and Thompson Brothers was formed, it continued to be

common practice for Thompson Brothers to sell crops pursuant to oral deferred payment

contracts.  (David Aff. ¶¶ 3, 4.)  Thompson Brothers and Miller (or any other buyer) would

agree upon a price at the time of sale and would defer payment to a later date—generally

right after the start of the new year.  (Id. ¶ 4.)

---

[14]Civ. No. 05-797.

In August 2003, Thompson Brothers sold wheat to Miller pursuant to an oral deferred payment contract. (Id. ¶ 6.) Under that agreement, payment for the wheat was to be deferred to the first working day of the new year. (Id. ¶ 7.) On January 5, 2004, Miller issued a check to Thompson Brothers in the amount of $24,443.22, as payment for the wheat.[15] (Id. ¶ 8.)

Thompson Brothers argues that the January 5, 2004 payment is not avoidable under § 547 because it was made in the ordinary course of business and is thus entitled to the defense in § 547(c)(2). The Trustee has moved for summary judgment on Thompson Brothers's defense, arguing that Thompson Brothers cannot establish that oral deferred payment contracts are within the ordinary business terms of the industry based on the Minnesota Grain Buyer's Act and the National Grain Trade Rules. The Court has considered and rejected this argument above. (See supra pp.10-12.)

The Trustee also contends that the ordinary course of business between Miller and Thompson Brothers does not support the application of the exception. (Mem. in Opp'n at 12-15.) As support for this argument, the Trustee cites to transactions between the parties in 2000-2001 and 2001-2002. In each of these time periods, Thompson Brothers delivered wheat to Miller in the prior year (2000 and 2001, respectively), and was paid for the wheat in March (not January) of the following year (2001 and 2002, respectively). (Id.

---

[15]The timing and course of this transaction is consistent with past transactions between Miller and the Thompsons, including transactions that occurred in 1996-1997, and 1997-1998 (see Ordean Aff. ¶¶ 6, 7), and in 2002-2003 (see Weinberg Aff. Ex. D).

at 14; Weinberg Aff. Exs. B, C.)  Therefore, according to the Trustee, January 2004

payment is not within the ordinary course of business between the parties.

In response to the Trustee's argument, Thomson Brothers has submitted evidence

that, at times, circumstances prevented the delivery of grain and subsequent deferred

payment by January.  (David Aff. ¶¶ 3, 5.)  However, they always sold their grain on a

deferred payment basis, even when delivery of the grain was delayed.  (Id. ¶ 4.)  With

respect to the two instances in which they were paid in March rather than January,

Thompson Brothers had been unable to deliver the grain until December of the preceding

year (whereas, in the subject transaction, they had delivered the grain in August of the

preceding year).  (Id. ¶¶ 5-8.)

The Court determines that Thompson Brothers has presented sufficient evidence to

establish that the January 2004 payment from Miller falls under the ordinary course of

business defense set forth in § 547(c)(2).  Despite the fact that in some years Thompson

Brothers was paid in March rather than January, there is no evidence to contradict that they

were always paid pursuant to oral deferred payment contracts, and often this occurred in

January of the year following the delivery of the grain to Miller.  Furthermore, Thompson

Brothers has submitted uncontradicted evidence that oral deferred payment contracts of the

type at issue here were standard business terms in the industry.  Accordingly, the Court

determines that summary judgment for Thompson Brothers is appropriate in this case, and

the Trustee's cross-motion for summary judgment will be denied.[16]

**E.      Defendant Nikle Farms Inc.[17]**

In the first days of November 2003, Defendant Nikle Farms Inc. ("Nikle Farms")

sold soybeans to Miller.  On November 5, 2003, Miller issued a check for $53,869.12 to

Nikle Farms as payment for the soybeans.[18]  The crops Nikle Farms sold to Miller were

subject to a perfected security interest held by Nikle Farms's bank, American Federal Bank

("American Federal").  American Federal completed a central filing notice as to those

crops under Minn. Stat. § 336A.04.  Therefore, according to Nikle Farms, under the Federal

Food Security Act, 7 U.S.C. § 1631(e), and Minnesota law, American Federal's security

interest was transferred with the crops, despite the sale from Nikle Farms to Miller.

To obtain a release of American Federal's security interest, Miller named American

Federal as a payee on the check issued to Nikle Farms.  Nikle Farms endorsed Miller's

check and delivered it to American Federal, thereby extinguishing its lien on the crops

purchased by Miller.

---

[16]The Trustee has also brought claims under 11 U.S.C. §§ 550 and 502(d).
Thompson Brothers asserts—and the Trustee does not dispute—that, to the extent
Thompson Brothers is successful on his § 547 defense, these claims must fail.  (Mem. in
Supp. at 6-7.)  Accordingly, Thompson Brother's motion for summary judgment as to these
claims will be granted as well.

[17]Civ. No. 05-795.

[18]The bankruptcy case was filed on February 3, 2004, placing the November 5, 2003
payment just within the 90-day preferential transfer period under § 547(b).

22

Nikle Farms argues that the sale of the crops to Miller and release of the lien by American Federal constitutes a contemporaneous exchange for new value under § 547(c)(1), and therefore, the payment is not avoidable by the Trustee.  The Trustee counters that, for a number of reasons, Nikle Farms has not made a sufficient showing to entitle it to summary judgment on this issue.  The Trustee argues that Nikle Farms must show that American Federal's security interest was perfected, that it remained perfected once it was sold to Miller, that it remained in Miller's possession at the time American Federal released its security interest, and that Nikle Farms has failed to show that the release of the security interest infused Miller's estate with "new value" within the meaning of the statute.

The Court determines that American Federal's release of its security interest in the crops was a substantially contemporaneous exchange.  Nikle Farms has presented evidence that American Federal's security interest was perfected at the time the crops were sold to Miller.  (Nikle Aff. ¶ 7, Ex. C.)  Furthermore, Miller indicated his understanding of American Federal's security interest in the crops he was purchasing by listing American Federal as a payee on the November 5, 2004 check.  (Id. Ex. B.)

In addition, Miller's estate was infused with "new value," as the payment to American Federal released the bank's security interest in the crops, which made them available for Miller to sell to other buyers immediately.  See Drabkin v. A.I. Credit Corp., 800 F.2d 1153, 1157-58 (D.C. Cir. 1986) ("We do not quarrel with the notion that release of an interest, such as a security interest, like the release of property of which a creditor

23

has possession and control, may be sufficient to satisfy the new value exception."); see also

In re Bellanca Aircraft Corp., 850 F.2d 1275, 1280 n.11 (8th Cir. 1988) (citing Drabkin

and other cases for the proposition that "several cases hold or suggest that payments to

third party creditors of the debtor can constitute new value").  The Trustee has not

presented the Court with any evidence raising a genuine issue of material fact to the

contrary.  Accordingly, the Court determines that summary judgment for Nikle Farms is

appropriate.[19]


### Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS**

**ORDERED** that:

1) With respect to Civ. No. 04-4957: Brian Nelson's Motion for Summary

Judgment (Doc. No. 28) is **GRANTED**, and the Trustee's Motion for Summary Judgment

(Doc. No. 33) is **DENIED**;

2) With respect to Civ. No. 05-794: Mark Wavra's Motion for Summary Judgment

(Doc. No. 27) is **GRANTED**;

---

[19]The Trustee has also brought claims under 11 U.S.C. §§ 550 and 502(d).  Nikle
Farms asserts—and the Trustee does not dispute—that, to the extent Nikle Farms is
successful on its § 547 defense, these claims must fail.  (Mem. in Supp. at 11-12.)
Accordingly, Nikle Farms's motion for summary judgment as to these claims will be
granted as well.

3) With respect to <u>Civ. No. 05-795</u>: Nikle Farms Inc.'s Motion for Summary Judgment (Doc. No. 11) is **GRANTED**;

4) With respect to <u>Civ. No. 05-797</u>: Thompson Brothers Farms LLP's Motion for Summary Judgment (Doc. No. 27) is **GRANTED**, and the Trustee's Motion for Summary Judgment (Doc. No. 33) is **DENIED**.

5) With respect to <u>Civ. No. 05-798</u>: Mitch Wavra's Motion for Summary Judgment (Doc. No. 28) is **GRANTED**.

Dated: May 5, 2006

<u>s/ Richard H. Kyle</u>
RICHARD H. KYLE
United States District Judge